**Rachel GREER, et al., Plaintiffs,**

v.

**UNIVERSITY OF ARKANSAS BOARD OF TRUSTEES, et al., Defendants.**

**No. LR–C–80–232.**

United States District Court,
E. D. Arkansas, W. D.

Aug. 3, 1982.

Philip E. Kaplan, Little Rock, Ark., for plaintiffs.

Nelwyn Davis, Asst. Atty. Gen., State of Ark., Little Rock, Ark., for defendants.

## MEMORANDUM AND ORDER

WOODS, District Judge.

### The Pleadings

Plaintiff Rachel Greer on May 13, 1980 filed a class action suit against the Trustees and Chancellor of the University of Arkansas at Pine Bluff (hereafter UAPB), a predominantly black unit of the University of Arkansas system. She claimed violation of 42 U.S.C. § 2000e and 42 U.S.C. § 1983 based upon sex discrimination and denial of equal rights. She sought injunctive relief, back pay and promotion to the position of Chairperson of the Health, Physical Education and Recreation Department. For other women similarly situated, she sought injunctive relief with regard to hiring, tenure, compensation, job classification, terms, conditions, and other privileges of employment.

Plaintiff is a white female employed in the Health, Physical Education and Recrea-

tion Department (hereafter HPER), who has filed timely charges with EEOC and has obtained notice of the right to sue. The complaint alleges that on March 6, 1979 a vacancy announcement for the position of Chairperson for HPER was posted, stating that applicants had until April 15, 1979 to submit their resumes and supporting documents. Plaintiff made timely application but was not given the position. Instead the vacancy was filled by Dr. Joseph Cornelius, a black male. The latter's vita was received on February 27, 1979. According to the complaint, he was the only applicant interviewed and was introduced at a luncheon on the campus as the new chairperson of HPER on March 1, 1979, five days prior to the vacancy announcement. Plaintiff Greer alleged that she was better qualified than Cornelius and had seven years of seniority with the defendant institution. She claimed that after Cornelius became head of HPER, he began a campaign of harassment and retaliation against her. Plaintiff claims sexual motivation in her lack of promotion and the harassment campaign. She further claims that the University maintains sex classification for certain job assignments whereby some jobs are limited to males and that the University discriminates against females in promotions and earnings.

The defendant University denied the allegations of the complaint. Subsequent to filing of the answer, Dr. Rosemarie Word was permitted to intervene. Dr. Word, a black female, alleged that she had applied for the position of Director of Student Teaching and Clinical Experiences on March 25, 1980 as a result of the pending retirement of Assistant Dean C. W. Dawson scheduled for June 30, 1980. On March 26, 1980 Dean Walter L. Littlejohn, Division of Teacher Education, wrote her that the position had been filled. In May, 1980 the operational budget for UAPB was published, designating Dr. Jesse Rancifer as Assistant Professor and Director. On June 4, 1980 an announcement of the vacancy of the Director of Educational Experiences was distributed. Dr. Word's intervention claimed that the announcement contained two qualifications which previously had not

been required of the incumbent—three years teaching experience at the public school level, preferably in math, and professional training or experience in the use and interpretation of statistical data. It was claimed that these qualifications were added to conform to Dr. Rancifer's personal work experience and had no valid relationship to the position. Dr. Word responded to the vacancy announcement and met with the search committee named to recommend Dawson's replacement. The intervention claimed that both Dr. Word and Dr. Rancifer were recommended without ranking but that Dr. Littlejohn advised Dr. Word that only Dr. Rancifer had been recommended. Dr. Word contends that she was more qualified, having been at UAPB for 19 years and having supervised student teachers for much of that time. In contrast, Dr. Rancifer was a new teacher with only two years of teaching experience at the college level and only three semesters of experience in supervising teachers. Dr. Word claimed that her unfair treatment was motivated by sexual discrimination. Defendants deny that the posted position had formerly been filled by Dawson and deny that the position on the operational budget was identical to that of Dawson. Defendants claim that an applicant with a math background was required to properly meet the job requirements. They further claim that Dr. Rancifer is better qualified than Dr. Word. They substantially deny the allegations in the intervention of Dr. Word.

The parties on February 2, 1982 stipulated in open court to a class consisting of all female faculty department heads and administrators from and after July 10, 1977.

### Stipulation

Prior to the trial of this cause, the parties entered into the following stipulation dated April 19, 1982:

1. The following facts are to be taken as true and that no further evidence of these facts will be introduced at trial.

2. The Stipulation is limited to an admission of the truth of the facts stipulated.

3. Plaintiff Greer is a tenured professor in the Health, Physical Education Department (hereinafter "HPER") at the University of Arkansas at Pine Bluff (hereinafter "UAPB"). She was initially hired in 1972 with a Ph.D. degree at the rank of Associate Professor. She has been promoted and has received tenure in accordance with the procedures of the Faculty Handbook.

4. Plaintiff Word is a tenured professor in the Elementary and Early Childhood Education Department at UAPB. She was initially hired in 1961 by UAPB's Predecessor institution, Arkansas A.M. & N. College, with a Master's degree at the rank of Instructor. She has been promoted and has received tenure in accordance with the procedures of the faculty handbook. (In 1972 A.M. & N. was merged with the University of Arkansas by Act 512 of 1971 and became UAPB.)

5. The Court has certified a class of all female faculty, department heads and administrators from and after July 10, 1977.

6. The Defendants are the Board of Trustees of the University of Arkansas which is the governing body for the University of Arkansas System, of which UAPB is a campus. Dr. Herman B. Smith, Jr. was the Chancellor of UAPB from July 1, 1974 through June 30, 1981.

7. During the academic year 1978–79 a vacancy occurred in the HPER Department. Plaintiff Greer applied for and was denied the position. Dr. Joe Cornelius was appointed Department Head for the academic year 1979–80. Dr. Cornelius resigned July 30, 1980. Vanette Johnson was appointed Acting Department Head and Athletic Director July 1, 1980 and has served in that position to the present.

8. During the academic year 1979–80 a vacancy occurred in the Division of Teacher Education. Plaintiff Word applied for the position of Director of Teacher Experiences and was denied the position. Dr. Jesse Rancifer was officially appointed Director July 1, 1980 and has served in that position to the present.

9. The parties stipulate that the case involves no issues of disparate impact on females as evidenced by Exhibits 8 through 15 to the Stipulation.

10. Females have consistently comprised 41%—42% of the total faculty at UAPB since 1976.

11. Females have occupied 25% to 39% of the positions of Department Heads since 1976.

12. Females have occupied 20% to 35% of the administrative positions since 1976.

13. Average salaries for females have in some instances exceeded those for males.

14. Following are the male and female promotions since 1977:

\* = 12 months  
– = no doctorate

1977 Promoted

| Name | Sex | Dept. | From Rank | Since | Promoted To | Date Hired |
|------|-----|-------|-----------|-------|-------------|------------|
| * Tae Nam | M | Hist. | Assoc. | 1973 | Prof/Chm. | 1973 |
| Josephine Bell | F | Mus. | Asst. | 1973 | Assoc. | 1968 |
| Freddie Hartfield | M | Math | Asst. | 1973 | Assoc. | 1947 |
| –* Sheldon McGee | M | Mus. | Asst. | 1973 | Assoc. | 1956 |
| –* Jacquelyn McCray | F | Home Ec. | Asst. | 1968 | Assoc. | 1968 |
| * Louis Faucette | F | Eng/AcAff. | Asst. | 1973 | Assoc. | 1968 |

1978 Promoted

| Name | Sex | Dept. | From Rank | Since | Promoted To | Date Hired |
|------|-----|-------|-----------|-------|-------------|------------|
| Rachel Greer | F | HPER | Assoc. | 1976 | Prof. | 1972 |
| * Jewel T. King | F | Home Ec. | Assoc. | 1975 | Prof. | 1960 |
| Qumare Morehead | F | Social. | Asst. | 1973 | Assoc. | 1965 |
| Richard Maxwell | M | Voc. Arts | Inst. | 1971 | Asst. | 1971 |

1979    Promoted

| Name | Sex | Dept. | From Rank | Since | Promoted To | Date Hired |
|------|-----|-------|-----------|-------|-------------|------------|
| —* Odie, Burris, Jr. | M | Music | Inst. | 1975 | Asst. | 1975 |
| —Terrence Corbin | M | Art | Inst. | 1975 | Asst. | 1975 |
| —Hartwell Wilson | M | Social. | Inst. | 1978 | Asst. | 1978 |

1980    Promoted

| Name | Sex | Dept. | From Rank | Since | Promoted To | Date Hired |
|------|-----|-------|-----------|-------|-------------|------------|
| * James R. Seawood | M | Voc. Arts | Assoc. | 1973 | Prof. | 1949 |
| * Scott Newton | M | Agri. | Asst. | 1977 | Assoc. | 1977 |
| Marion Olion | F | Elem. Ed. | Asst. | 1977 | Assoc. | 1977 |
| Chog Soo Tai | M | Hist./PolSC | Asst. | 1976 | Assoc. | 1977 |
| —* Henri Linton | M | Art | Asst. | 1969 | Assoc. | 1969 |
| * Clara Jennings | F | Elem. Ed. | Assoc. | 1977 | Prof. | 1977 |
| * Fadelle Olion | M | Spec. Ed. | Assoc. | 1977 | Prof. | 1977 |
| * Dan S. Green | M | Social. | Assoc. | 1977 | Prof. | 1977 |
| * Lina Godfrey | F | Home Ec. | Assoc. | 1975 | Prof. | 1975 |
| Laverne Hanners (Rec'd PhD '78) | F | Ed. Med. | Assoc. | 1969 | Prof. | 1969 |
| Juanita Torrence | F | Eng. | Assoc. | 1973 | Prof. | 1961 |
| Rose Word | F | Elem. Ed. | Assoc. | 1973 | Prof. | 1961 |
| * Bobbie Irwins | F | HDES | Assoc. | 1974 | Prof. | 1974 |

1981    Promoted

| Name | Sex | Dept. | From Rank | Since | Promoted To | Date Hired |
|------|-----|-------|-----------|-------|-------------|------------|
| * Josephine Bell | F | Mus. | Assoc. | 1977 | Prof. | 1968 |
| * Esther Glover | F | Home Ec. | Assoc. | 1975 | Prof. | 1975 |
| * Jacquelyn McCray | F | Home Ec. | Assoc. | 1977 | Prof. | 1968 |
| * Richard Maxwell | M | Voc. Arts | Asst. | 1978 | Assoc. | 1971 |
| Matthew Henry | M | Bus. | Asst. | 1973 | Assoc. | 1969 |
| * Carolyn Gaylord | F | Spec. Ed. | Asst. | 1977 | Assoc. | 1977 |
| Evra Murphy | F | Soc. | Inst. | 1976 | Asst. | 1976 |
| Ernest Walker | M | Indus. Tech. | Inst. | 1973 | Asst. | 1973 |
| * Eliz. Ferguson | F | Home Ec. | Inst. | 1973 | Asst. | 1973 |
| * Geraldine Buchingham | F | Bus. & Econ. | Inst. | 1970 | Asst. | 1970 |

---

15.    Male and female tenure since 1977 is as follows:

TENURE

* Doctorate

1976

| Name | Sex | Dept. | Date Hired | at | Rank | Tenured |
|------|-----|-------|------------|-----|------|---------|
| * Tae Nam | M | Hist. | 1973 | | Assoc. | 1976 |

\* Doctorate

<u>1977</u>

| Name | Sex | Dept. | Date Hired | at | Rank | Tenured |
|---|---|---|---|---|---|---|
| Sandra Faucette | F | Fresh Studies | 1969 | | Inst. | 1977 |
| Eddie L. Higgis | F | Home Ec. | 1972 | | Inst. | 1977 |
| \* Jacquelyn McCray | F | Home Ec. | 1968 | | Asst. | 1977 |
| \* Jewell T. King | F | Home Ec. | 1960 | | Inst. | 1977 |
| David Houston | M | Agr. | 1975 | | Assoc. | 1977 |
| Kwang Lee | M | Agri. | | | | |

<u>1979</u>

| \* William McArthur | M | Arts & Scis. | 1976 | | Assoc. | 1979 |
| Edith Neal | F | Home Ec. | 1972 | | Inst. | 1979 |
| Ernest Walker | M | Indus. Tech. | 1973 | | Inst. | 1979 |
| William Wang | M | Bus. & Econ. | 1971 | | Asst. | 1979 |

<u>1980</u>

| Chang Soo Tai | M | Hist./PolSc. | 1976 | | Asst. | 1980 |
| \* Scott Newman | M | Agri. | 1977 | | Asst. | 1980 |
| \* Marion Olion | F | Elem. Ed. | 1977 | | Asst. | 1980 |
| \* Clara Jennings | F | Elem. Ed. | 1977 | | Assoc. | 1980 |
| \* Ladelle Olion | M | Spec. Ed. | 1977 | | Assoc. | 1980 |
| Syed M. Aijaz | M | Chem. | 1976 | | Assoc. | 1980 |
| \* Carolyn Blakely | F | Eng. | 1971 | | Asst. | 1980 |
| Elizabeth Ferguson (Ph.D. 1980) | F | Home Ec. | 1973 | | Inst. | 1980 |
| \* Robert Haynes | M | Agri. | 1977 | | Assoc. | 1980 |
| Revelyn Jones | F | Eng. | 1969 | | Inst. | 1980 |
| Laura Joseph | F | Speech & Drama | 1967 | | Inst. | 1980 |
| Peter Lopez | M | For. Lang. | 1967 | | Asst. | 1980 |
| Lucille Meadows | F | Home Ec. | 1972 | | Inst. | 1980 |
| Patricia Meadows | F | Eng. | 1976 | | Inst. | 1980 |
| Vera Solomon | F | Eng. | 1964 | | Asst. | 1980 |
| Betty Williams | F | Eng. | 1970 | | Inst. | 1980 |
| \* Esther Glover | F | Home Ec. | 1975 | | Assoc. | 1980 |

<u>1981</u>

| O. D. Burris | M | Mus. | 1975 | | Asst. | 1981 |
| Alice Hines | F | Eng. | 1972 | | Inst. | 1981 |
| Lawrence Sykes | M | Lib. | 1970 | | Assoc. | 1981 |
| Gladys Young | F | Elem. Ed. | 1953 | | Asst. | 1981 |

16. During the 1980–81 academic year average female salaries across all faculty ranks at UAPB exceeded average male salaries.

17. Thirty-six percent of all faculty and administrators hired since 1976 have been female.

## FINDINGS OF FACT

### GENERAL

1. Dr. Herman Smith was Chancellor at UAPB from July 1, 1974 until June 30, 1981. He was thus the highest ranking official during the times pertinent to this litigation. He was succeeded by the present Chancellor, Dr. Lloyd B. Hackley.

2. There were three Vice Chancellors during this period: L. A. Torrance, Vice Chancellor for Student Affairs, Aaron Van Wright, Vice Chancellor for Academic Affairs, and Benson Otovo, Vice Chancellor for Fiscal Affairs.

3. In choosing the heads of departments in the University of Arkansas system, when there are several equally qualified applicants, the initial recommendation is made by the Dean. It then goes to upper level administration.

4. Salary decisions and promotion for a Department Chairperson are based upon recommendations by the Dean. They are then reviewed by the Vice Chancellor for Academic Affairs, the Chancellor and the President and are then approved in a budget meeting with the Board of Trustees.

5. Dr. Walter Littlejohn is Dean of the Division of Teacher Education and has held this position since 1975. When he became Dean, he reorganized Teacher Education into six departments. These were (1) HPER (Dr. Kenneth Johnson), (2) Elementary Education (Dr. Clara Jennings), (3) Secondary Education (Dr. Theodore Elliott), (4) Educational Media (Dr. A. G. Kirby), (5) Special Education and Psychology (Dr. Ladell Olion), and (6) Vocational Teacher Education (Dr. Jewell King). Dr. Jennings and Dr. King are female. The others are male. These six departments have now been reduced to four departments. Special Education and Psychology have been merged into Secondary Education under the chairmanship of Dr. Theodore B. Elliott. Educational Media has been eliminated. Two of the remaining four departments are chaired by men, Dr. Elliott and Dr. Vanette Johnson. Two are chaired by women, Dr. King and Dr. Jennings. The salaries budgeted for these individuals in 1981–82 and 1982–83 were as follows:

|                     | 1981–82  | 1982–83  |
|---------------------|---------:|---------:|
| Dr. Clara Jennings  | $31,100  | $34,815  |
| Dr. Vannette Johnson| 31,201   | 33,541   |
| Dr. Theodore Elliott| 29,310   | 31,874   |
| Dr. Jewell King     | 28,676   | 31,543   |

6. When Dr. Lloyd Hackley became Chancellor at UAPB in September, 1981, the President of the University placed all department chairpersons on an acting status in order to give Hackley flexibility in deciding whether to retain or replace them (T. 554). He has moved four chairpersons out of nineteen back to their former positions. They are Dr. Ted Elliott (Secondary Education), Dr. Clara Jennings (Elementary Education), Dr. Grace Wylie (Music) and Dr. Verlene Coleman (English).

7. The affirmative action plan at UAPB during the previous administration was sadly lacking in concept and enforcement, particularly with respect to sexual discrimination. I find that in practice such a plan was virtually nonexistent. The new Chancellor has testified that he is going to appoint a new affirmative action officer forthwith and that the plan will be rewritten "to bring it up to date and more in line with current thinking about affirmative action" (T. 556).

8. Sex is not a significant factor statistically with regard to pay at UAPB.

9. The Division of Teacher Education and particularly the HPER Department has been pervaded with a discriminatory attitude toward women. This attitude in HPER reached gross proportions after the appointment of Dr. Joe Cornelius as Department head. Cornelius carried on an unbelievable campaign of harassment and discrimination against virtually all the women in this department. The details of the campaign will be set forth, *infra*.

10. The administrative superiors of Dr. Cornelius either were aware or should have been aware of the vendetta being carried on by the latter against the women in HPER. Particularly is this true of Dean

Walter Littlejohn, who bears a major share of the responsibility for bringing Cornelius to UAPB.

11. Dean Walter Littlejohn has displayed insensitivity to discrimination against women on the basis of sex. This is demonstrated by his refusal to intercede and prevent the mistreatment to which women were subjected in HPER by Cornelius and also in the manner in which Dr. Rosemarie Word and Dr. Clara Jennings were treated. This will be detailed *infra.*

## DR. RACHEL GREER

1. Dr. Rachel Greer received a Bachelor of Science degree in Education and a Master's degree from the University of Central Arkansas. She received a doctorate from Northwestern State University in 1972. Since that time she has taught at UAPB and has been a full professor in the HPER Department since 1978. In this department there are two other women, Anne Finley and Mrs. Mildred Coleman. There are five men—Dr. Vannette Johnson, the Acting Chairperson, Lennis Coleman, U. S. Grant, H. O. Clements, and Dr. Kenneth Johnson.

2. Dr. Kenneth Johnson had for many years been Departmental Chairperson of HPER. He was removed by the Chancellor in the spring of 1979, creating a vacancy in this position, effective July, 1979.

3. As a practical matter the position of HPER Chairperson was filled by the Chancellor without posting it or appointing a search committee. At the time Dr. Joe Cornelius was made department head, the fact that a vacancy was in the offing was not widely known either on the campus or in HPER. In fact, Dr. Kenneth Johnson did not know he was to be replaced (T. 10). The principal reason given by Dr. Smith for hiring Cornelius was that he had gone to a high school in California with two swimming pools, that he could probably teach swimming and that he had a nationwide breadth of experience (T. 278–80).

4. On March 1, 1979 there was a luncheon held on campus at which Chancellor Herman Smith introduced Dr. Joe Cornelius as the new Chairperson of the Department (T. 354). On April 13, 1979 all faculty members in HPER wrote a letter of protest to Dean Walter L. Littlejohn, Division of Teacher Education, protesting the manner in which Dr. Kenneth Johnson was removed. The letter, copies of which were sent to the Chancellor, made the following points:

1. Dr. Johnson was not informed in writing about his being terminated.

2. A prospective candidate for the position was interviewed here on campus prior to any notification to Dr. Johnson that he was being removed from the position.

3. Vacancy announcements pertaining to the position were circulated prior to Dr. Johnson being informed that he was to be removed.

4. No members of our department were included in the interview that has already been held.

Dr. Littlejohn responded that search committees were only utilized for the position of vice chancellor or above. He also stated:

1. Dr. Kenneth L. Johnson, through our conferences, has been since early February, knowledgable [sic] of chairperson plans for the 1979–80 academic year.

2. The interview on campus with Dr. Joe Cornelius took place more than one month after our conference concerning the chairperson position in Health, Physical Education and Recreation.

3. Vacancy Announcements appeared more than a month after our conference with Dr. Kenneth L. Johnson, Sr.

5. The vacancy announcement dated March 6, 1979 requesting resume, supporting documents and references by April 15, 1979 set forth the following responsibilities and qualifications:

*Responsibilities* :

Will have the overall responsibility for the activities of the department, including: stimulating and implementing program development; advising students

and teaching undergraduate students in health, physical education or recreation, and convening and chairing regularly scheduled department meetings. In addition, will participate actively in committee assignments within the University, and be expected to provide leadership in research activities and in facilitating grant proposals.

*Qualifications:*

Must have an earned doctorate in a field of study applicable to the curricular offerings of the department, demonstrated excellence as a teacher, and public school administrative experience or appropriate leadership ability. In addition, must have commitment to research in administration, a record of scholarly achievement, and an ability to represent the department to the educational community.

6. Dr. Greer submitted her application for the position on April 12, 1979, consisting of her vita and letters of recommendation (PX 5). Dr. Vannette Johnson also made application at approximately the same time. Both Dr. Greer and Dr. Johnson met the criteria of the vacancy announcement and both were better qualified to head the department than Dr. Cornelius.

7. From outside the department the two candidates were Dr. Cornelius and Dr. Joe Brown, Jr. On March 22, 1979 Dr. Littlejohn sent a memo to HPER faculty requesting evaluation of these two candidates based on their vitae (PX 6). Dr. Brown was the Baseball Coach and Assistant Professor of Health & Physical Education at Albany College, Albany, Georgia (PX 8). Dr. Cornelius was Associate Professor of Health & Education at Knoxville College, Knoxville, Tennessee (PX 7). The vita from Dr. Cornelius was shown by stamp to have been received on February 27, 1979 (PX 7). The University administrators by memo dated April 5, 1979 were requested to make an evaluation of the latter, since they "had the pleasure of interacting with Dr. Joe Cornelius" (PX 9).

8. By letter dated May 2, 1979 (PX 10), Dr. Littlejohn advised Dr. Greer that her credentials were impressive and that she had the qualifications to chair HPER. However, he stated:

The nature of our thrust over the next three years in preparing teachers has influenced us to consider a person with previous experience of heading Departments of Health, Physical Education and Recreation, and with a record of success and involvement in securing private and federal grant funds.

At that time Dr. Joe Cornelius had never been a department chairperson.

9. In July, 1979 Dr. Greer filed a sex discrimination charge with EEOC in which she stated that she was denied promotion, paid unequal wages and was subjected to unfair treatment in that:

1. I was not even considered for the position of Chairman of the HPER Department by not being granted an interview by Dr. Walter Littlejohn, male, Dean of Teacher Education even though I had over seven years seniority with the respondent.

2. I had obtained my doctoral degree and the Title of Professor and was more qualified for the position than Dr. Joe Cornelius, male selectee for the position.

3. As a professor I was paid a lower salary than Mr. Leon Hardy, male Asst. Professor. Assistant Professor is of a lower status because it requires less education and less teaching experience.

4. I was denied a higher salary in that I was not allowed to teach in the summer until 1975, and in that I am now only allowed to teach one summer term. Male teachers have always been given the option to teach both summer terms.

5. I was denied administrative experience, in that it was the policy of the Physical Education Department that the position of Assistant to the department chairman was to be filled on a rotating basis. When it became my turn to fill the position, I was

denied the opportunity. A man has continued to fill this position. (PX 12.)

10. During the time that Dr. Cornelius was head of the Department, he engaged in a campaign of harassment toward Dr. Greer. On several occasions he asked Ms. Alma Murphy, the basketball and volleyball coach how she could stand to be around those white bitches—Rachel Greer and Ann Finley—and on one occasion told Ms. Murphy that when they were in the office alone, "he would come and hold the door if Ms. Murphy would go in and whip those white bitches" (T. 390). Dr. Cornelius' equivocal explanation of these incidents is less than satisfactory and is inconsistent. Another example of the type of harassment engaged in by Dr. Cornelius is Plaintiff's Exhibit No. 13, consisting of a memo from Cornelius to Dr. Littlejohn alleging that Dr. Greer had informed him "that she did not intend to teach the courses assigned to her for the spring semester. She also explained to me at this time that she had filed a lawsuit against UAPB." I find that the allegations contained in this memo are completely false. Dr. Cornelius also assigned Dr. Greer a 7:30 A.M. and a 6:00 P.M. to 8:50 P.M. class on the same day, which was contrary to University policy and which was changed after Dr. Greer took the matter up with Dr. Van Wright, Vice Chancellor for Academic Affairs.

11. On November 26, 1979 Dr. Greer filed a complaint with the EEOC charging that Cornelius had engaged in harassing and retaliatory actions against her (PX 14). Her specific charges were as follows:

Dr. Cornelius has been unreasonable and prejudical [sic] in his assignment of course work.

1. Because our department is short one teacher, I volunteered to teach an 18 hr. class load. The normal class load is 12 hours.

2. Dr. Cornelius added to my burden by assigning to me both a 7:30 a. m. class and a 6:00–8:50 p. m. class in the same day.

3. The 7:30 night class which I have been assigned is an off campus class. It is a university policy at UAPB that employees who are given off campus teaching assignments are to be given extra compensation, when they teach an overload. Dr. Littlejohn informed me that I would not be given extra compensation for the night class I was given.

On November 15, 1979 a meeting was set up between Dr. Van Wright, Vice Chancellor of Academic Affairs, Dr. Cornelius and myself in order to discuss my teaching schedule.

1. On that same day Dr. Cornelius informed me that as a result of my badgering that my teaching load would be reduced. However, he refused to alleviate my burden of having a 7:30 p. m. class on the same day.

2. At this time Dr. Cornelius also told me that he had a few things he wanted to tell me and I was to write these things down. He then proceeded to personally attack me with the following insults:

a. "Compare your transcripts to mine—with your 5 or 6 D's; you are not superior to me."

b. "Intellectually you lack luster."

c. "I do not want anyone to emulate you; I wouldn't want anyone's daughter to emulate you."

d. "You are a disgrace to the profession and a disgrace to womanhood."

e. "You are a distasteful person."

3. Dr. Cornelius refused to sign my transcript of his speech. However, I did read my transcript to Dr. Van Wright and it was witnessed by his secretary, Ms. Janice Favors.

These actions are in retaliation for my filing a charge of discrimination against UAPB.

12. I find that the charges made by Dr. Greer in the EEOC charge immediately *supra* are true and correct. I also find that the abusive remarks mentioned in this charge were made by Dr. Cornelius. Dr. Cornelius' attempt to explain the "context"

in which these incidents occurred is not acceptable. They were recorded at his direction contemporaneously in a handwritten memo by Dr. Greer (PX 15). Cornelius has loaded Dr. Greer's personnel file with a number of critical, nit picking memos (see, e.g. PX 16, 17, 19, 20, 21 and 24). Dr. Greer has satisfactorily explained her actions (T. 35–49), and I find the critical comments to be without basis and the result of ill will toward Dr. Greer. This will was reflected in his evaluation of Dr. Greer (PX 22) and his memo of April 16, 1980 to Dr. Littlejohn reading as follows (PX 21):

> As a result of Dr. Greer's disruptive behavior in the department; continuous disregard for orderly procedures; and flagrantly missing assigned classes, I have no recommendation regarding retention of Dr. Greer at this time.

13. Dr. Greer has been an active member of the American Alliance for Health, Physical Education and Recreation which is a national organization of persons involved in these fields of study and activity. She has had a significant role in conventions of the organization (PX 25) and has held a number of committee offices. In the fall of 1979 she was nominated for the office of President-Elect of the Southern District of this organization, which covers the thirteen southern states and has a membership of 12,000 professionals. Because this would be a three-year commitment and would require Dr. Greer to be off campus at times, she had to secure the permission of Chancellor Smith to become a candidate for the office. This request was made in a letter dated November 26, 1979 (PX 27). This permission was refused by Dr. Smith (PX 28), although a similar request was granted for a faculty member at the University of Arkansas at Little Rock. Dr. Greer was for five years the Executive Secretary-Treasurer of the Arkansas Women's Intercollegiate Sports Association (AWISA). She has also served as President of the Arkansas Association for Health, Physical Education, Recreation and Dance. Dr. Cornelius refused to give her leave to attend the national convention of AWISA, even though AWISA paid her expenses and she had attended in prior years while serving as Executive Secretary-Treasurer.

14. Dr. Cornelius was hired on the initiative of Dean Littlejohn and approval of Chancellor Smith without a rudimentary investigation being conducted of his background and qualifications. Cornelius had little or no supervisory experience. An adequate investigation would have revealed that he had administered a summer youth sports program and that his performance was unsatisfactory. In fact, his performance was so unsatisfactory that the Federal Government threatened to withdraw funding if Cornelius continued as Director. I find that Dr. Cornelius did not have the qualifications or experience of either Dr. Rachel Greer or Dr. Vannette Johnson, the other UAPB applicants for the head of HPER.

15. Dr. Greer was criticized by Chancellor Smith and Dean Littlejohn as being a chronic complainer. I find this criticism to be unjustified. From time to time Dr. Greer did submit written suggestions to the Department Chairperson for improvement of the department (See, e.g. PX 60, 61). She also complained about a student's receiving an "A" who had not attended a class taught by one of her male colleagues (PX 62, 63).

16. Dr. Vannette Johnson is the Acting Chairperson at HPER. He was an applicant for chairperson along with Dr. Greer at the time Dr. Cornelius was selected to head the department. He had previously served as football coach and Athletic Director at UAPB. He held the latter position from 1962–1974 (T. 637). He had also served as administrative assistant to the chairperson for five or six years. I find that Dr. Johnson was far better qualified for Department Chairperson than Dr. Cornelius and that he, no less than Dr. Greer, was injured by the gross improprieties in filling this position. I find that when Dr. Cornelius was chosen as department head, neither Dr. Vanette Johnson nor Dr. Greer was properly and adequately considered for the position of chairperson.

1096

17. When Dr. Cornelius left UAPB after a one-year stint, Dr. Vanette Johnson was made Acting Chairperson, a position which he now holds. I am not prepared to state that Dr. Greer was the victim of sexual discrimination by not being named acting chairperson. Dr. Vanette Johnson's credentials and experience are impressive. When the position of permanent Chairperson of HPER is filled, both Dr. Greer and Dr. Johnson are entitled to be considered. Sex should not be considered in filling this position. Qualifications and experience should be the touchstone.

## DR. ROSEMARIE WORD

1. Dr. Rosemarie Word is Professor of Education in the Department of Elementary and Early Childhood Education. She has a Bachelor Degree and a Master of Education from the University of Arkansas and a Doctorate from Kansas State University with a major in Elementary Education and a minor in Early Childhood Education. She has been at UAPB continuously since 1961 except for a leave of absence for work at Arkansas State University with Project Headstart during the school year 1970–71 and a leave to obtain her Ph.D. 1976–78.

2. C. W. Dawson at the time of his retirement on June 30, 1980, was Assistant Dean of the Division of Education. His primary duty and responsibility was to act as the teacher certification officer and as the Director of Student Teaching. In the spring of 1980 Dr. Dawson had announced his plan to retire at the end of the school year. On March 25, 1980 Dr. Word applied for the position being vacated by Mr. Dawson in a letter to Dr. Walter L. Littlejohn (PX 30). Dr. Littlejohn replied in a letter dated March 26, 1980 as follows:

Over the past several months I have made an extensive review of the credentials of all faculty within the Division of Teacher Education, and based on that review and on what we have conceived as our needs for the 1980's, a recommendation has already been made for a person to assume the majority of the responsibilities that were a part of the job description of the assistant dean. (PX 33.)

3. On March 25, 1980 Dr. Clara Jennings, Chairperson of the Department of Elementary and Early Childhood Education, wrote Dr. Littlejohn a letter of recommendation on behalf of Dr. Word (PX 31). In part the letter read as follows:

Dr. Word's professional experiences dictate her readiness to assume such a position in Teacher Education. She serves on many State Department of Education Committees. She has worked closely with Mr. Austin Hanner, Director of Teacher Certification in the State of Arkansas on matters relative to licensing of teachers in this state. She is the Vice President of IHE Elementary/Early Childhood Organization in the state. Recently, she was appointed to the newly formed State Department of Education Resource Center Advisory Board and the Pine Bluff School District Board of Education Gifted and Talented Advisory Board. Her contact with school district superintendents across this state is hard to match.

She has a long history of supervising student teachers in institutions of higher education. She has supervised student teachers at UAPB and Kansas State at Manhattan, Kansas.

Recently, Dr. Word worked closely with the Department's Evaluation Committee on evaluating Elementary/Early Childhood Education Program Graduates. This study is expected to be completed by the first of May, 1980.

With the above information, that only depicts part of Dr. Word's experiences, I feel that she would be most fitting to the position for which she is applying.

4. In the UAPB 1979–80 budget, four individuals are listed in the Division of Teacher Education. In the No. 2 slot is Cornelius W. Johnson, Professor at a salary of $22,903. In the 1980–81 budget the name of Jesse L. Rancifer appears in the No. 2 slot as Assistant Professor Director at a salary of $24,000. The other personnel are the same. The budget documents are kept in the library at UAPB. The first

indication Dr. Word received that Rancifer had been appointed to Dawson's position was when Dr. Word saw the entry in the 1980–81 budget in early May, 1980. I consider it highly significant that Dr. Rancifer was budgeted to *this* position long before the vacancy was announced. On May 30, 1980 Dr. Word wrote Dr. Littlejohn another letter (PX 37) containing *inter alia* the following paragraph:

It shall not go without notice that almost 60 days have passed since you stated selection had been made for a person to assume the majority of the responsibilities that were a part of the job description of the Assistant Dean. As of this date, no announcement has been made of a successor of the incumbent who will vacate his position as of July 1, 1980. This leaves about 30 days to receive applications, evaluate, interview, and select a successor to begin working on July 1, 1980.

No response was made to this letter, but a notice of vacancy was posted on June 4, 1980 (PX 38).

5. The notice of vacancy for Position Title "Director of Educational Experiences" mentioned, *supra* listed "Responsibilities" and "Qualifications" as follows:

RESPONSIBILITIES

Coordinator of Field Experiences for all teacher education majors and general supervision of student teachers will be a major portion of the responsibilities of the position. Other responsibilities will include serving as certification officer for teacher education, conducting follow-up studies of teacher education graduates, and providing statistical analysis of the effectiveness of the teacher education program; advising, making recommendations to, and assisting the Dean of the Division of Teacher Education in the overall operation of programs related to field experiences of students in the Division of Teacher Education.

QUALIFICATIONS

Earned doctorate, with a minimum of one degree in education, a minimum of three years of teaching experience at the public school level; preferably in mathematics, professional training or experience in the use and interpretation of statistical data. (PX 38.)

6. The section of the qualifications dealing with teaching experience in mathematics and professional training or experience in the use and interpretation of statistical data bore no reasonable relationship to the duties of this position, and the inclusion of such qualifications was simply a pretext for excluding Dr. Word from this position and making it available to Dr. Rancifer, who had taught math in high school (T. 3621).

7. For the position of Director of Educational Experiences, the qualifications of Dr. Word were superior in all respects to those of Dr. Rancifer (T. 364).

8. On July 9, 1980 Dr. Littlejohn wrote as follows:

This letter is written to inform you officially that the search committee for the Director of Educational Experiences has completed its work, and Dr. Jesse Rancifer has been recommended for the position, effective July 1, 1980. (PX 42.)

This statement was incorrect and misleading. As a matter of fact, the search committee had recommended both Dr. Word and Dr. Rancifer to be submitted unranked (PX 44).

9. In response to an inquiry of February 13, 1981, Dr. Littlejohn furnished a job description for the Director of Educational Experiences (PX 45). This job description reads as follows:

1. Certification Officer for Teacher Education

2. Development of and directing student teacher placement files

3. Maintaining all records on laboratory experiences for the division (e.g. Secondary Education, Elementary Education, Vocational Arts, Health, Physical Education & Recreation, Special Education)

4. Supervising the utilization of the Education Building by on campus groups and outside agencies

5. Supervising the janitorial services for the Education Building

6. Planning, management and evaluation for follow-up program on Teacher Education graduates

7. Scheduling of room use for all classes in the Teacher Education Building

8. Maintaining records of Student Teacher Battery Examinations and English Proficiency Examinations for all Teacher Education majors

9. Management and evaluation of Academic Advisory Systems for the division

10. Planning and execution of other responsibilities as may be assigned by the Dean of Education from time to time (PX 46)

10. The reasons given for employing Dr. Rancifer over Dr. Word as Director of Educational Experiences were pretextual. (a) The defendants state that there was need to have a person who could teach the mathematical professional course to develop programs to comply with the new regulations of the State Department of Education for Certification in middle school mathematics. Defendants claimed that there was no one in the Division who could teach the math courses, and since the University could not hire additional people, it had to make use of the personnel presently employed. These reasons were pretextual because middle school math was not being taught at UAPB by Dr. Rancifer or anyone else. If such a course were necessary, Dr. Rancifer could teach it without being made Director. (b) Defendants claim that Dr. Word had supervised student teachers only three years out of nineteen years. I find this statement to be incorrect. Dr. Word has supervised student teachers during almost all of her nineteen years of service at UAPB. (c) Defendants claim that Dr. Rancifer worked as a graduate assistant in the capacity of Director of Educational Experiences and that Dr. Word had no such experiences. They also claim that his doctoral dissertation was on student teachers and that he supervised student teachers at the high school level for many years prior to his employment at UAPB. I find that these claims asserted by the defendants are incorrect. Dr. Rancifer was associated with the Teacher Aid program at Kansas State and not as Director of Educational Experiences. His dissertation title was "An Investigation of Attitudes toward Mathematics Determining the Election or Non-Election of College Preparation Mathematics by Secondary Black and White Students" (PX 55). (d) Defendants claim that Dr. Word told Dr. Littlejohn that she was only interested in directing student teaching and not in any of the other responsibilities related to the job. Dr. Word denies making such a statement and I credit her testimony and find that she made no such statement.

11. The reasons given in testimony by Dr. Littlejohn for not recommending Dr. Word for the position of Director of Educational Experiences were patently pretextual and were a thinly disguised method of discriminating against her on the basis of sex. She possessed substantially better qualifications for the position than the male applicant Rancifer and should have been awarded the position on the basis of qualifications, experience, seniority and professional standing (T. 360, 361).

12. One of the reasons that Dr. Littlejohn gave for recommending Dr. Rancifer over Dr. Word was that there was a need for follow-up studies of graduates in the teaching area. I find that this was not a valid reason for preferring Dr. Rancifer and that Dr. Word could have performed this function as well as Dr. Rancifer. Dr. Littlejohn also testified that he was more impressed by the letters of recommendation received on behalf of Dr. Rancifer. I can detect no difference in the letters of recommendation, and I regard this reason for preferring Dr. Rancifer as being pretextual. Dr. Littlejohn also testified that Dr. Word had difficulty in associating and working with others. This testimony is not substantiated, and I do not credit it in view of other testimony concerning Dr. Word.

## DR. CLARA JENNINGS

1. Dr. Clara Jennings is Chairperson of the Department of Elementary and Early

Childhood Education and has occupied this position since 1976. She has a Bachelor of Science in Elementary Education from UAPB, a Masters in Education from Wayne State and a Ph.D. from Michigan State University in Elementary Education. At the time she came to UAPB in 1976, she was teaching at Herbert H. Lehman College in New York City.

2. I find that because of Dr. Jennings' support of Drs. Word and Greer, she has been harassed by her administrative superiors. For instance, she was sharply criticized in a letter dated September 23, 1981 from Dean Littlejohn for missing four monthly meetings of Academic Affairs and Educational Policies Committee and not having filed leave blanks. Two of these leave blanks were signed by Littlejohn himself, and on one occasion she was excused by Vice Chancellor Van Wright. When this was pointed out, Dr. Littlejohn criticized her for not having other representatives from her department. She then produced evidence that in at least three of the four meetings members from her department were in attendance (PX 66). I find that the criticism directed at Dr. Jennings was unjustified and that male chairpersons missed meetings without being subjected to criticism.

3. Further evidence of the unfair manner in which Dr. Jennings was treated is apparent from her evaluation by Dean Littlejohn dated March 9, 1982 covering the period from July 1, 1981 to March 9, 1982 (PX 58). She was initially given very low ratings in Student Advisory Budget Management Reports to the Dean, Follow-Up of Graduates, Long-Range Planning, Inter-Division Cooperation, Evaluation of Faculty, Staff and Scholarly Activities. Dr. Jennings understandably took exception to this evaluation which constituted a serious reflection on her professional competence. She made a detailed response to the evaluation (PX 67). Some upward adjustments were made in her evaluation. I find that the original evaluation of Dr. Jennings was grossly unfair. While there was some upgrading, I find that the entire evaluation is tainted by sexual discrimination and should be removed from the personnel file of Dr. Jennings. I accept the testimony of Dr. Jennings with regard to the lack of basis for this extremely critical evaluation (T. 369–73).

3. In company with all other chairpersons, the President of the University of Arkansas placed Dr. Jennings in an acting status. The new Chancellor has now restored four department heads to their former positions, including Dr. Jennings. Hopefully, this presages a different attitude toward Dr. Jennings and foreshadows fair and equitable treatment toward her by the new administration.

## MS. ALMA MURPHY

1. Ms. Alma Murphy has a B.S. degree from UAPB and a M.A. degree from Texas Women's University. She has 48 hours toward a Ph.D. in Physical Education. She has been at UAPB since 1967. She coaches women's basketball, volleyball and softball. From July 1, 1979 to June 30, 1980 she was the coordinator of Women's Athletics, Administrative Assistant and Women's Basketball Coach. A job description of this position appears in PX 70. From July 1, 1980 to June 30, 1981 she was Assistant Athletic Director, Women's Basketball Coach and instructor in HPER.

2. Ms. Murphy's salary in 1977–78 was $12,447, while she was serving as instructor in HPER and Women's Basketball Coach. As Assistant Athletic Director and Women's Basketball Coach and instructor in HPER, she made $22,069 for the school year 1981–82.

3. Ms. Murphy makes the same salary as the head coach of men's basketball. She is an exceptional coach and has coached her team to the national small college championship one year.

## MS. ANNE FINLEY

1. Anne Finley has a B.S. degree from Northeast State University, Monroe, Louisiana, and a M.E. degree from Northwestern State University, Natchitoches, Louisiana. She has been at UAPB since 1973.

2. Ms. Finley coached volleyball, 1974–77 and complains about sexual discrimination during this period. However, it is outside the stipulated time period, and I will not consider incidents about which she testified during this period.

3. Ms. Finley's complaints are mainly concerned with her office and classroom facilities and her salary in comparison to male coaches and professors in HPER. I have examined her exhibits and testimony and find that she has not sustained her burden of proving that she is a victim of sexual discrimination in these regards.

4. I find that Ms. Finley was subjected to abuse and intimidation by Dr. Cornelius during the time that he chaired the Department (T. 428). He criticized her for belonging to professional organizations, threatened her in the event she tried to approach his administrative superiors and threatened to keep her from acquiring tenure (T. 428–29). This conduct was directed toward Ms. Finley from the outset of the Cornelius chairmanship.

5. Even though, according to applicable University regulations (these have now been changed), a professor was supposed to receive tenure after teaching at UAPB for eight years, Dr. Cornelius without any justification refused to recommend Ms. Finley for tenure. Dr. Littlejohn and Dr. Smith at first went along with Cornelius and only after a substantial delay and a vigorous assertion of her rights did Ms. Finley receive tenure. I find that in this regard Ms. Finley was inconvenienced and prejudiced as a result of sexual discrimination and that she is entitled to be compensated therefor.

## PATRICIA ANN BEHLAR

1. Dr. Patricia Ann Behlar has a B.A. in history from the University of New Orleans and a M.A. and Ph.D. from Louisiana State University, the former in Government and the latter in Political Science. She is an Assistant Professor in the Department of History and Political Science at UAPB and has held this position for five years. She does not have tenure.

2. The Chairperson of the Department is Dr. Tae Y. Nam. The others in the department with their 1981–82 and 1982–83 salaries are as follows (PX 75):

| | 1981–82 | % of raise over previous year | 1982–83 | Raise | % |
|---|---|---|---|---|---|
| Tae Nam | $30,000 | 8.56 | $31,605 | $1,505 | 5.00 |
| DeWitt Davis | 22,260 | – | 24,263 | 2,003 | 8.99 |
| Buford Satcher Position | 21,500 | – | 23,560 | 2,060 | 9.58 |
| Henry Wilkins III | 20,083 | 6.23 | 21,689 | 1,606 | 7.99 |
| C. S. Tai | 17,763 | 8.25 | 19,361 | 1,598 | 8.99 |
| John S. Taylor | 15,125 | – | N.I.B. | | |
| Patricia A. Behlar | 14,723 | 5.66 | 15,606 | 883 | 5.99 |
| Douglas Herman Position | 13,000 | – | 14,300 | 1,300 | 10.00 |

All are Ph.D's except Mr. Wilkins. Dr. Davis, Dr. Satcher, Dr. Tai and Mr. Wilkins are Associate Professors. The others are Assistant Professors. (T. 448.)

3. Dr. Behlar's principal complaints are that she has not been assigned upper level courses and that she has been assigned several introductory history courses, when history is not her graduate field. She also complains that a faculty person with less seniority has been assigned to teach constitutional law, which is her favorite course and subject.

4. The constitutional law course was first offered in the fall of 1977 and taught by Dr. Behlar. Forty-one students registered for the course, and there were twenty-five withdrawals plus a number of student complaints. She taught the same course in the fall of 1978. Fifty-one students registered but thirty students withdrew. Her dean and department head were justifiably concerned at such a high withdrawal rate, and her department head counseled with her concerning her teaching methods. In 1979 she again taught the course. Eleven students registered and four withdrew. The drop in enrollment resulted in part because the course was dropped as a requirement for a degree in Criminal Justice. This change was made because of student complaints about Dr. Behlar's teaching. In the fall of 1980, thirteen students registered and three withdrew. In the fall of 1981 the course was assigned to Dr. John Taylor, and there were no student complaints.

5. Dr. Behlar filed a grievance with regard to the failure to assign the constitutional law class to her (T. 469). Her position was summarized in a letter to Dr. Lloyd V. Hackley, dated September 23, 1981 (PX 80): "I am protesting the assignment of Constitutional Law I, a course which I have taught since joining the UAPB faculty in 1977, to Dr. John Taylor and the assignment of only sophomore level courses to me." The position of the administration is summarized in a letter from Vice Chancellor Van Wright to Chancellor Hackley dated October 2, 1981 (PX 80): "Both of us are in agreement that Dr. Behlar does not have a legitimate complaint or grievance."

6. Dr. Nam, who heads Dr. Behlar's department, testified that she came to UAPB as an assistant professor. He has not recommended her for promotion. His evaluation for promotion is based on the following four factors: Teaching, research, community services, and public relations (T. 576). Dr. Nam testified that he found her teaching was deficient, based on student complaints and the high dropout rate. According to Dr. Nam she has done no research and has only published book reviews (T.

577), and he found Dr. Behlar deficient in regard to community service (T. 577). He also testified that she had declined some departmental committee assignments (T. 578–80). I find that Dr. Nam has articulated legitimate nondiscriminatory reasons for failing to promote Dr. Behlar and for not assigning her to teach a course in constitutional law or upper level courses. I further find that she has failed to sustain her burden of proof that she was discriminated against on the basis of sex.

## CONCLUSIONS OF LAW

[1-4] The parties have stipulated that the case involves no issues of disparate impact. In a disparate treatment case "proof of discriminatory motive is critical." *Kirby v. Colony Furniture*, 613 F.2d 696, 702 (8th Cir. 1980). Intentional discrimination must be shown in a disparate treatment case. This means that the intentional unfair employment practices are deliberate and not accidental. However, willfulness on the part of the employer is not a requisite. *Kober v. Westinghouse Electric Corp.*, 480 F.2d 240 (3d Cir. 1973). In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n.15, 97 S.Ct. 1843, 1854, n.15, 52 L.Ed.2d 396 (1977), the Supreme Court said:

> "Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment .... Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.

In this case I find abundant evidence of discriminatory motive in the area of sex discrimination. The motive was particularly evident in HPER, the focus of most of the complaints in this case. HPER is one of the departments within the Division of

Teacher Education, which is the site of the other discriminatory treatment established in this case. Fortunately, the disparate treatment at UAPB seems to have been localized in one division and to a considerable extent within one department of that division. As the Third Circuit made clear in a recent decision, "academic institutions and decisions are not ipso facto entitled to special treatment under federal laws prohibiting discrimination." *Kunda v. Muhlenberg College*, 621 F.2d 532, 545 (3d Cir. 1980).

■ The major cases are those of the plaintiff, Dr. Rachel Greer, and the intervenor, Dr. Rosemarie Word. Their cases are controlled by similar legal precedents. Clearly, both established a prima facie case of sex discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Those cases established the following criteria, amply satisfied in the cases of Greer and Word, for a prima facie showing of sexual discrimination: (1) they belonged to a protected group; (2) they applied for a job for which UAPB was seeking applicants; (3) despite their qualifications, they were rejected; and (4) after their rejection the UAPB filled the position with a person of their qualifications. *See, Coble v. Hot Springs School District No. 6, et al.*, 682 F.2d 721, 724–725 (8th Cir. 1982).

■ With regard to Dr. Rosemarie Word, the guidelines under the factual findings and legal precedents, *supra* are clear. While defendants attempted to articulate legitimate, nondiscriminatory reasons for choosing Dr. Jesse Rancifer over Dr. Word, the reasons are clearly pretextual and are not persuasive. Beyond any doubt Dr. Rancifer was preselected by Dr. Littlejohn and the administrative hierarchy. The selection process was a charade. It is clear that "procedural irregularities could be considered in connection with its finding that the discrimination was intentional." *Kunda v. Muhlenberg College, supra* at 545. Requirements specified in the vacancy notice bore little or no relationship to the advertised position and were included in order to tailor the vacancy announcement for conformity to Dr. Rancifer's background. See *Coble v. Hot Springs School District No. 6, et al., supra*, at pp. 727–729. Dr. Word's qualifications, seniority and experience were superior to Dr. Rancifer's and she was denied the position solely on the basis of sexual discrimination. The subjective reasons given for hiring Dr. Rancifer are unpersuasive. "When the evaluation is in any degree subjective and when the evaluators themselves are not members of the protected minority, the legitimacy and undiscriminatory basis of the articulated reasons for the decision should be subject to particularly close scrutiny by the trial judge." *Royal v. Missouri Highway & Transportation Comm.*, 655 F.2d 159, 164 (8th Cir. 1981). Defendants are directed to immediately place Dr. Rosemarie Word in the position of Director of Educational Experiences and to pay her an amount equal to the difference in the pay for this position and her salary drawn since July 1, 1980. The touchstone of Title VII remedies is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). The parties are directed to agree on the latter amount and submit a joint memorandum for the entry of final judgment.

The legal principles enunciated, *supra* are also applicable to Dr. Greer's case. There are some factual similarities as well. Unquestionably Dr. Cornelius was preselected by Dr. Littlejohn and Dr. Smith for the position before the vacancy was advertised and before there was general knowledge on campus that there was such a vacancy. As with Dr. Word, the selection process was a farce. No applications were given consideration except that of Dr. Cornelius. In addition to Dr. Greer, Dr. Vannette Johnson applied for the position. It is possible that Dr. Johnson was better qualified than either of the other applicants. Dr. Cornelius was the least qualified of the three. Nevertheless he was the only one considered as successor to Dr. Kenneth Johnson when the

latter was removed as of July 1, 1979. Dr. Cornelius himself held the position for only one school term, after which Dr. Vannette Johnson was made Acting Chairperson. On the basis of the evidence adduced in this case, I cannot state that the latter decision was sexually motivated.

■ No permanent Chairperson of HPER has yet been named. Dr. Greer should be considered for this position, as well as Dr. Vannette Johnson and any other qualified applicants male or female. I am, however, going to render judgment in Dr. Greer's behalf in an amount equal to the difference in her salary and that of the Department head from July 1, 1979 until a permanent chairperson is selected (PX 57). In addition I will compensate her in the amount of $5,000.00 for the abuse to which she was subjected during the tenure of Dr. Cornelius. She was unquestionably damaged by the failure to have her application properly considered and also by the abuse from Cornelius. "The fact that the discrimination in this case took place in an academic rather than commercial setting does not permit the court to abdicate its responsibility to insure the award of a meaningful remedy." *Kunda v. Muhlenberg College, supra* at 550.

■ Like Dr. Greer, Ms. Anne Finley was also subjected to abuse and harassment from Dr. Cornelius. Her principal difficulty was that receipt of tenure was wrongfully withheld for a period of time, and he subjected her to other abuse and harassment. Because this abuse and the withholding of tenure were motivated by an attitude of sexual discrimination, I am going to enter judgment in Ms. Finley's behalf in the amount of $2,500.00.

■ Ms. Alma Murphy, who coaches women's basketball at UAPB, has compiled an exceptional record. Her salary was substantially equalized with that of the men's basketball coach three years ago for which the UAPB is to be commended. However, during 1977–79, a period covered by this litigation, there was serious differential between salaries of the two coaches. UAPB recognized this inequity and has now corrected it. However, I find that Ms. Murphy is entitled in this class action litigation to the salary differential in the period July, 1977 to July, 1979. The parties are directed to agree on this figure and submit a memorandum. I will enter final judgment in this amount on behalf of Ms. Murphy.

■ This leaves only the claim of Dr. Clara Jennings for disposition. The only damage which she has sustained is the inclusion of a critical evaluation in her personnel file at UAPB. This evaluation by Dr. Littlejohn has been discussed, *supra.* I direct that it be removed from her file, destroyed and completely expunged from her personnel record.

On the basis of the factual findings, *supra,* Dr. Behlar is not awarded any relief in this proceeding. With regard to her claim, the comments of the Third Circuit in *Kunda v. Muhlenberg College, supra,* are appropriate:

> Wherever the responsibility lies within the institution, it is clear that courts must be vigilant not to intrude into that determination, and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges. *Id.* at 548.

In rendering my decision in this case, I have tried to be sensitive to these considerations. The testimony, however, has revealed practices of sexual discrimination too blatant to overlook. "The status of women in academia has been a subject of concern to scholars and others." *Kunda v. Muhlenberg College, supra* at 550. For a documentation of that concern, see the comprehensive opinion of Judge Sloviter in that case and particularly pages 550–51.

Defendants are permanently enjoined from considering sex when making future job decisions relating to promotion, pay, assignment and tenure. Defendants are also directed to restrain from engaging in any of sort of retaliatory conduct directed at females who are attempting to enforce their rights with respect to employment at UAPB.