360 S.E.2d 387

Bonnie B. CURREY

v.

STATE OF WEST VIRGINIA HUMAN
RIGHTS COMMISSION and E.I.
DuPont de Nemours & Co., etc.

and

E.I. DuPONT de NEMOURS & CO., etc.

v.

Bonnie B. CURREY, Russell Van Cleve,
individually and in his capacity as
Chairperson of the West Virginia Hu-
man Rights Commission, and the West
Virginia Human Rights Commission.

No. 17494.

Supreme Court of Appeals of
West Virginia.

Decided July 16, 1987.

Norris Kantor, Katz, Kantor, & Perkins, Bluefield, Mary C. Buchmelter, Asst. Atty. Gen., Charles G. Brown, Atty. Gen., Emily A. Spieler, Dist. Atty. Gen., for appellants.

George G. Guthrie, Charleston, for appellees.

PER CURIAM:

This is an appeal by Bonnie B. Currey and the West Virginia Human Rights Commission from an order entered by the Circuit Court of Kanawha County on March 5, 1986. That order reversed a decision of the Human Rights Commission entered on May 10, 1984, finding E.I. DuPont de Nemours & Co. guilty of sex discrimination and directing that the company promote Mrs. Currey and pay her back pay for a specified period of time. On appeal the appellants claim that the circuit court erred in reversing the Commission's decision. We disagree, and we affirm the decision of the Circuit Court of Kanawha County.

On October 11, 1973, Bonnie B. Currey instituted this proceeding by filing a complaint with the Human Rights Commission alleging that DuPont had failed to promote her because of her sex, in violation of W.Va. Code § 5–11–9. Lengthy hearings were held on the complaint and concluded on October 12, 1981.

The facts, as developed during the hearings, showed that Mrs. Currey began working for DuPont on May 1, 1960, as a clerk-typist. After May, 1966, she was a production clerk, and from February, 1970, until October 10, 1973, she occupied the position of cost clerk.

During the late 1960's, DuPont began computerizing its data collection and processing procedures. In that period clerical positions involving the recording, organization, and analysis of data were filled on a seniority basis. In 1973 the company altered its promotion guidelines and began considering factors in addition to seniority in making promotions. According to one memorandum the new factors were "level and field of education or training, work experience, need for particular skills, written and oral expression required, use of mathematics and overall quality of performance ..."

Also in 1973, DuPont reorganized the personnel in its accounting division. In the reorganization certain employment positions were abolished, and five new "accounting clerk" positions were created. Among the positions abolished was the "cost clerk" position occupied by Mrs. Currey. That cost clerk position had been classified as a "grade six" position. The new accounting clerk jobs were classified as "grade eight" and carried an entitlement to higher wages than the grade-six positions.

In conjunction with the reorganization, DuPont announced that it was accepting applications for the five new accounting clerk positions. Mrs. Currey and seventy other employees applied for the new positions. To identify the individuals who ultimately would be promoted from the large field of applicants, DuPont followed a rather complex selection procedure. Two committees were set up composed of wholly different individuals. The first committee was charged with narrowing the field of applicants to fifteen finalists. The second committee selected the individuals to be promoted from among the finalists. The first committee was charged with assessing the basic qualifications of the applicants, in light of the job description and in light of long-term historical performance.

The individual members of the second committee interviewed the finalists and later met, and each proposed five candidates for promotion. Criteria considered included education, job experience with DuPont, performance, schooling to prepare for additional responsibility, and potential for advancement beyond the situation being considered. The selection process of the second committee required several weeks.

After going through the initial selection process, Mrs. Currey was named as one of

the fifteen finalists for the five new positions.[1] In all, nine of the fifteen finalists were males, six were females. At the conclusion of the second selection process, DuPont selected three males and two females for the new positions. Mrs. Currey was not one of the individuals chosen for promotion, and as a consequence she was laterally transferred from her grade-six cost clerk job, which was being abolished, to another grade-six job.

After being transferred, Mrs. Currey filed the complaint instituting the present proceeding and charging that DuPont's failure to promote her was motivated by sex discrimination.

To prove sex discrimination, Mrs. Currey challenged the validity of the selection process as applied, suggesting that it was invalid because it resulted in the promotion of two individuals less qualified than she, Carol Simpson and Carman Adams.[2] She also independently argued that she was better qualified than Carman Adams, and that her old grade-six cost clerk position was simply relabeled by DuPont so that

1. In conjunction with initiating the selection process of the individuals who were to fill the new accounting clerk positions, DuPont issued a job description of the new functions. In the section of the description describing requisite education and know-how, DuPont specifically stated "an understanding of sophisticated computer systems for processing payrolls, controlling inventories and preparing cost accounting records is required." During the hearings in the case, Mrs. Currey was asked whether there were any duties or functions for the position of accounting clerk that as of October, 1973, she had not performed. Her reply was:

> I must make a statement because I believe that there is inaccurate information in the fact that the computer knowledge is not necessary in performing the duties of the accounting functions and I do not possess computer knowledge, only from the input status. Other than that, I have performed the duties.

When asked again whether she possessed the computer knowledge, she definitively stated that she did not.

Although Mrs. Currey took issue with the point that computer knowledge was required for the accounting clerk positions, Carman Adams, who was later promoted to one of the accounting clerk positions, testified that over time the position evolved significantly and that at the time of his testimony probably 70% of the accounting clerk's work was machine generated.

This evidence suggests that Mrs. Currey was not fully qualified for promotion, though with regard to computer knowledge, there is no evidence that she was less qualified than the individuals who were ultimately promoted. DuPont considered her sufficiently qualified to be among those ultimately considered for promotion.

2. Additionally, Mrs. Currey testified that she was the subject of sexual harassment in the early 1960's when she was first employed by DuPont. She indicated that her supervisor, Mr. Nesbitt, forced himself on her. When asked specifically what Mr. Nesbitt had done, she testified that at Christmas time, at a party, he had kissed her. Asked about further incidents, she said:

> Well, on the following Christmas, I was relieving on the switchboard and he proceeded to go to the basement and told me to come down, he wanted his Christmas kiss, and I refused to do so and he pouted for two days after that.

These incidents did not form a formal finding upon which the Human Rights Commission based its decision. The circuit court noted that the events were far removed from the allegations relating to the promotion and that there was no evidence connecting them to the promotion.

It should be noted that Mrs. Currey last worked under Mr. Nesbitt in 1964, some nine years before the personnel actions which gave rise to the present claim. There is evidence that Mr. Nesbitt was on the committee which narrowed the field of seventy-one applicants to fifteen finalists. It may be inferred from the fact that Mrs. Currey was chosen as a finalist that Mr. Nesbitt's attitude toward her was not a significant negative factor in the consideration of her. Mr. Nesbitt was not on the final selection committee.

Mrs. Currey also attempted to show that one of the two females selected, Carol Simpson, was less qualified for promotion than she, and that Ms. Simpson was promoted because she had a personal relationship with Fenton Brannon, who was involved in the selection process.

In his initial findings the hearing examiner specifically found: "There is no proof in the record as to when the Brannon/Simpson relationship began or, specifically, whether that relationship preceded and influenced the Accounting Clerk process.... I do not find a prima facie case and no violation of law as to this charge as such." This finding is supported by this Court's examination of the record. It is not raised directly as an issue on appeal. However, as discussed in the body of the opinion, the hearing examiner found that Carol Simpson was less qualified than Mrs. Currey and concluded that from the fact that she was promoted, even if her promotion was not motivated by sex factors, it could be inferred that DuPont's selection process was not objectively applied.

she could be shifted out of it and so that a male could be moved into it at a grade eight pay level. The thrust of her argument, both before the Human Rights Commission and on appeal, was and is that since the selection process was invalidly applied, since she was better qualified than a male who was promoted, and since her old cost-clerk position was simply relabelled and a male moved into it at higher pay, she was the victim of sex discrimination.

At the conclusion of the hearings in the case, the Human Rights Commission found that DuPont had committed sex discrimination against Mrs. Currey by promoting the male, Carman Adams, who the Commission found was less qualified than Mrs. Currey. The Human Rights Commission also found that DuPont's selection process did not involve a true objective procedure, as applied in practice, and that the selection procedure resulted in the selection of two lesser qualified individuals, namely Carol Simpson and Carman Adams.

DuPont appealed the Commission's decision to the Circuit Court of Kanawha County. The circuit court reviewed the record and concluded that Mrs. Currey failed to introduce direct evidence that she was denied promotion because of her sex. The court also found that the evidence failed to show that she was better qualified for promotion than the male, Carman Adams. The court, therefore, reversed the decision of the Human Rights Commission and vacated the judgment in Mrs. Currey's favor. It is from that ruling that the appellants now appeal.

On appeal the appellants argue that the circuit court erred by substituting its judgment for that of the Human Rights Commission, in violation of the appropriate standard of review. They also argue that the evidence does demonstrate that Mrs. Currey was better qualified than Carman Adams and that she was shifted from her old grade-six job so that a male could be moved into it and paid at the grade-eight level. In view of this evidence, the appellants argue that the circuit court's findings of fact were erroneous.

In syllabus point 2 of *Shepherdstown Volunteer Fire Department v. State ex rel. State Human Rights Commission*, 172 W.Va. 627, 309 S.E.2d 342 (1983), this Court stated:

Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: "(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

See, *Frank's Shoe Store v. West Virginia Human Rights Commission*, No. 16913 (W.Va. July 10, 1986). Clearly under this law an appropriate function of a circuit court in processing an appeal from the Human Rights Commission is the review of the reliable, probative, and substantial evidence presented before the Commission. If that evidence demonstrates that the Commission's findings of fact and conclusions of law are clearly wrong, the circuit court may properly reverse the decision of the Human Rights Commission.

One of the principal points that the Human Rights Commission cited in arriving at its decision that DuPont had been guilty of sex discrimination was its conclusion that the selection process did not involve a truly objective procedure. In arriving at this conclusion the Human Rights Commission found that two of the individuals selected by DuPont were less qualified than Mrs. Currey and inferred from the fact the lesser qualified individuals were selected that

the procedure was flawed.[3] The Human Rights Commission first focused upon the female, Carol Simpson. The hearing examiner, in his initial findings, stated:

"Simpson, one of the final selections in October of 1973, had no apparent qualification for the Accounting Clerk position.... Simpson had no prior effective experience with the duPont accounting system. She had no educational background in accounting. Her training on the switchboard, according to her former supervisors Cross and Goff, provided no training for the job of Accounting Clerk. Furthermore, her selection jumped her from Level 2 switchboard operator to a Level 8 Accounting Clerk. Simpson had no apparent qualifications for the job, and was certainly less qualified than Currey."

An examination of the record initially suggests that the hearing examiner's conclusion is correct. It is true that Simpson was a switchboard operator prior to her promotion, and it is true that as a result of the promotion Simpson moved from grade two to grade eight. However, a thorough examination of the record shows that the examiner ignored certain facts in reaching his conclusion. The record actually shows that Simpson was initially hired by DuPont on February 8, 1965. From December 16, 1966, she worked in the "Accounting Section". On February 14, 1969, she resigned from DuPont because she was moving to Florida. At that time she was designated a "Production Clerk", a type of accounting clerk.

Ms. Simpson decided not to remain in Florida, and when she returned to West Virginia, she again sought employment with DuPont. At that time there was apparently no appropriate job for her, and until one opened up, she was assigned as a grade two switchboard operator.

Based on this evidence, this Court believes that the hearing examiner's statements that Ms. Simpson "had no prior effective experience with the duPont accounting system" and that she "had no apparent qualifications for the job" were clearly wrong. Likewise, the facts in the record explain why an otherwise incomprehensible transfer from a grade-two switchboard position to a grade-eight accounting position was plausible.

A review of the record shows that, at the time of the 1973 reorganization, DuPont's accounting division was undergoing rapid change, due, in part, to increasing computerization. It is clear from the record that DuPont did not in the future intend to handle its accounting in the same ways as it had handled it in the past. The record suggests that it is for that reason that DuPont shifted from relying almost wholly upon seniority and past experience in making promotion selections to factors which would suggest that a candidate for promotion might adapt to change and to a new computerized team approach to the job. The job description for the new accounting positions indicated that factors to be con-

---

3. Mrs. Currey also suggested that DuPont did not follow the selection process as designed. She initially claimed that she had been interviewed by only one member of the final selection committee. On cross-examination she admitted that she had talked with other members of the committee. Mr. Thomas E. Wren, who was involved in the selection process, also indicated that the interviews were conducted and that, in addition to material gathered in the interviews, the committee relied upon annual performance review sheets maintained on the applicants.

A part of the cross-examination of Mrs. Currey proceeded as follows:

Q. Are you saying then that there could have been an interview?

A. Well, if they considered just talking an interview, it was done in a poor manner, to the extent that I was not aware of being interviewed. Mr. Oaklander did it in a formal interview. That is the only one with whom I spoke.

Q. Well, did Mr. Barrett, for example speak to you with regard to the accounting clerk position?

A. Again, not in a formal communication regarding the accounting position.

Q. My question was did he speak to you with regard to the accounting clerk position before the accounting clerk positions were filled?

A. He spoke to all members of the accounting division.

Q. Well, you are being somewhat evasive.

A. Your question is evasive.

Later Mrs. Currey admitted to having conversations, but not formal interviews.

sidered included, in addition to work experience, "level and field of education or training" and "written and oral expression required." There was testimony that schooling to prepare for additional responsibility and potential for advancement beyond the position to be considered were factors involved in the selection process.

■ While the evidence in the record rather clearly shows that Mrs. Currey had more experience in DuPont's old accounting procedures than Carol Simpson, it does not show that overall Mrs. Currey was better qualified than Simpson, given the criteria announced by DuPont prior to making the selections. The record definitely shows that Ms. Simpson had more education than Mrs. Currey. Ms. Simpson had completed three years at Ohio University in English and Psychology and had taken additional courses at Marietta College and was within approximately one semester of receiving her B.A. degree. Additionally, she had one semester of secretarial training at "Mountain State." By comparison, Mrs. Currey had one year of secretarial training at "Mountain State." [4]

Likewise, over the years Ms. Simpson had received higher performance ratings than Mrs. Currey:

|      | Simpson | Currey |
|------|---------|--------|
| 1970 | A       | B      |
| 1971 | A       | B      |
| 1972 | A       | B +    |
| 1973 | B +     | B +    |

Finally, there was evidence that Ms. Simpson was "Aware of people relationships," "learns rapidly," had "Remarkable ability to 'keep cool'" and "Good judgment, quick perceptive mind, understanding of human nature, ... good-humored." On the other hand, there was evidence that Mrs. Currey was extremely sensitive to the way that other people communicated and acted toward her and that this prevented her from being a strong team-performer. As characterized by Mr. Cross, one of Mrs. Currey's supervisors, "There was not what I would consider a great deal of friendliness between [Mrs. Currey and her peers]—business-like in contacts, some abrasiveness or friction." Also: "She was a perfectionist, not tolerant of those less precise. At times some of these events would cause some degree of emotional upset."

■ This Court believes that this evidence contains both objective and subjective facts which show that the hearing examiner's finding that "Simpson had no apparent qualifications for the job, and was certainly less qualified than Currey" was clearly wrong. Objectively, Simpson had more education and better performance ratings than Mrs. Currey. Subjectively, it showed that Simpson was flexible, better able to work with people and adapt to change, factors which, in this Court's opinion, may be legitimately considered in making job promotions.

■ In assessing the objectivity of DuPont's selection procedures, the Human Rights Commission also found that the male, Carman Adams, was less qualified than Mrs. Currey.

During the hearings witnesses for DuPont pointed to two factors which led to the promotion of Mr. Adams over Mrs. Currey. The factors were the fact that Mrs. Currey had an attendance problem

---

**4.** During trial the attorney for Mrs. Currey attempted to show that Ms. Simpson's education had no bearing on her qualification for an accounting position because it did not specifically equip her with accounting skills. This point suggests a question inherent throughout the proceedings in this case, the question of whether qualification for promotion hinges upon whether an individual is possessed only of certain very definite, definable skills, or whether qualification involves such intangible characteristics as flexibility, ability to communicate, and adaptability. The Human Rights Commission took the narrow view, and essentially concluded that because Mrs. Currey had more specific accounting experience, she was better qualified than Carol Simpson and Carman Adams. This Court believes that while the possession of specific skills is certainly important in selecting individuals for promotion, an employer may legitimately consider other factors such as overall education, ability to communicate, ability to work with others, physical capacity to perform a job, and interest in and probable dedication to the job. Ms. Simpson's education, this Court believes, would point to the possession of subjective factors relevant to her consideration.

which had a significant impact in the accounting area and the fact that Mrs. Currey was a perfectionist, which reduced the total workload which she could handle.

Mr. Robert Cross, who was DuPont's Accounting Supervisor until mid 1971 and who was Mrs. Currey's supervisor, described the work involved in DuPont's accounting posts. He stated:

> Accounting has very rigorous time schedules and very rigorous close-out schedules, certain financial deadlines, and some of them are legal, I might add, have to be met in a very certain way, a certain volume of work, a certain workload that has to be met. It is on a daily cycle basis, such and such work in such and such an accounting period and work has to be done in any orderly, progressive manner. It is very difficult to catch up in it at the last minute if it hasn't been done routinely.

Mr. Cross also stated that because accounting had to be done within rigorous schedules, absenteeism from work could have a significant effect upon a person's dependability in an accounting position. Mr. Thomas Wren, who was involved in the selection procedure, echoed the opinion that absenteeism was a factor in the selection process. James Sagle explained that accounting data produced by the accounting department was used to maintain the inventories of raw materials necessary to keep DuPont's production going. If proper inventories were not maintained, operation could not be sustained. Timely accounting reports were necessary to replenish the inventories in a timely manner. There was evidence that pinpoint accuracy was not required, but that timely "ballpark" figures were necessary.

Witnesses called by DuPont suggested that Mrs. Currey was not as qualified as Mr. Adams to produce the required accounting data and reports. The absentee records of the two individuals show the following days absent: [5]

|      | Adams | Currey |
|------|-------|--------|
| 1966 | 0     | 7      |
| 1967 | 0     | 8      |
| 1968 | 1     | 11½    |
| 1969 | 1     | 11     |
| 1970 | 0     | 18     |
| 1971 | 0     | 3      |
| 1972 | 0     | 9      |

Also, the witnesses indicated that Mr. Adams was very efficient in producing required data in a timely manner. On the other hand, Mrs. Currey's performance was not as good. Mr. Sagle said:

> I think the problem we had and Bonnie was having was that Bonnie's concern for detail, for double-checking all the work and just getting out the volume of work that was needed and within the time constraints we had in the division.

In the overall area of job performance, the evidence indicated that Mr. Adams was

5. The hearing examiner discounted the possibility that absenteeism was a real factor in the selection process, saying: "DuPont's witnesses focused on Currey's attendance problems. Yet, Currey's attendance is certainly comparable to that of Rosemary Rexroad and Carol Simpson, both of whom were applicants." A review of the record, however, shows that Mrs. Currey's attendance was not as consistently good as that of any of the five individuals promoted. The record shows the following days of absence for the five individuals and Mrs. Currey:

|      | Simpson (female) | Chumley (male) | Miller (male) | Rexroad (female) | Adams (male) | Currey (female) |
|------|------------------|----------------|---------------|------------------|--------------|-----------------|
| 1966 | 0                | 1              | 0             | 3                | 0            | 7               |
| 1967 | ½                | 15             | 0             | 0                | 0            | 8               |
| 1968 | 0                | 0              | 0             | 4½               | 1            | 11½             |
| 1969 | 0                | 0              | 0             | 0                | 1            | 11              |
| 1970 | 4½               | 2              | 0             | 1                | 0            | 18              |
| 1971 | 22               | 0              | 0             | 2                | 0            | 3               |
| 1972 | 1½               | 0              | 0             | 50               | 0            | 9               |
| 1973 | 0                | 0              | 0             | 1½               | 2            | 49½             |

better qualified than Mrs. Currey. The performance ratings of the parties showed the following:

|      | Adams | Currey |
| ---- | ----- | ------ |
| 1970 | B+    | B      |
| 1971 | B+    | B      |
| 1972 | B+    | B+     |
| 1973 | A     | B+     |

In terms of formal education, Mr. Adams and Mrs. Currey were essentially equal. Mrs. Currey did have more varied job experience with DuPont.

After reviewing the evidence as a whole, this Court believes that the findings of the Human Rights Commission relating to the superior qualification of Mrs. Currey to Carol Simpson and Carman Adams are simply not supported by the record.

A final assertion that Mrs. Currey made in support of her claim that sex was a determinent in DuPont's promotion scheme was the fact that her old grade-six cost clerk position was simply relabeled so that she could be shifted out of it and a male moved into it at a grade-eight pay level. The evidence shows that the individual who took over the bulk of Mrs. Currey's cost clerk functions, Parker Hood, also assumed the functions of an individual named Sue Bibbee. In effect, a large part of the work performed by two separate individuals was combined in the new accounting clerk position. Parker Hood did not step into Mrs. Currey's shoes and perform precisely the same work she was performing. There is evidence that he performed additional duties which would justify an increase in pay and a shift in the employees who performed the functions.

As explained herein, the evidence adduced in this case simply does not show that Mrs. Currey was better qualified for promotion than either Carol Simpson or Carman Adams. Since she was not better qualified than those individuals, it cannot be inferred that DuPont's actions were motivated by sex discrimination. In view of this, and in view of the fact that Mrs. Currey failed to prove discrimination directly, this Court believes that the Human Rights Commission's finding of sex discrimination was clearly wrong. Under the rule in *Shepherdstown Volunteer Fire Department v. State ex rel. State of West Virginia Human Rights Commission, supra,* the Circuit Court of Kanawha County properly could have, and did, reverse the decision of the Human Rights Commission.

The judgment of the Circuit Court of Kanawha County is, therefore, affirmed.

Affirmed.