406 S.E.2d 434

**TOWN OF ROMNEY HOUSING AUTHORITY, Appellee,**

v.

**WEST VIRGINIA HUMAN RIGHTS COMMISSION and Joan M. Gates, Appellant.**

**No. 19625.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 16, 1991.

Decided March 28, 1991.

Dissenting Opinion of Chief Justice Miller July 31, 1991.

Lawrence M. Schultz, Askin, Pill, Scales & Burke, L.C., Martinsburg, for appellant.

Lawrence E. Sherman, Jr., Royce B. Saville, Royce B. Saville, L.C., Romney, for appellee.

PER CURIAM:

This is an appeal by Joan M. Gates from an order of the Circuit Court of Hampshire County entered on February 23, 1989. That order reversed a decision of the West Virginia Human Rights Commission finding that the appellant had been the victim of sex discrimination and awarding her back pay and incidental damages. On appeal, the appellant claims that the record establishes that she was the victim of discrimination and that the circuit court erred in reversing the decision of the Human Rights Commission. After reviewing the record, this Court disagrees. Accordingly, the judgment of the Circuit Court of Hampshire County is affirmed.

In late 1983 or early 1984, there was a vacancy in the office of executive director of the Town of Romney Housing Authority. To fill that vacancy, the Housing Authority placed an advertisement in the *Hampshire Review*, a newspaper of general circulation in Hampshire County. The advertisement stated that the qualifications for the position were housing management experience and knowledge of the rules and regulations of the Federal Department of Housing and Urban Development. It further indicated that applicants for the position should submit resumes between February 15 and March 5, 1984.

Four persons, two males and two females, applied for the position. The appellant Joan M. Gates, was one of the female applicants.

On March 6, 1984, the Board of Commissioners of the Housing Authority met and considered the candidates, and after approximately an hour of deliberations awarded the position to Dale Moore, a male applicant who had previously been serving as temporary or interim executive director of the Housing Authority. Following the selection, the Housing Authority advised the appellant, by letter dated April 10, 1984, that she had not been selected, but that her resume would be kept on file for one year. The letter also thanked her for her interest in the position.

On June 15, 1984, the appellant filed a complaint with the Human Rights Commission, alleging that she had not been selected for the position as a result of sexual discrimination. In her complaint, she alleged that Dale Moore, the male who had been selected, was a local man with no prior housing experience, and that she had thirteen years experience as a professional paid property manager, in addition to a family background in property management.

After extensive preliminary proceedings, a hearing was held before a Human Rights Commission hearing examiner on May 28, 1986. At the conclusion of that hearing, the hearing examiner found that the appellant was a female who was qualified for the position of executive director. He indicated that the advertisement published by the Housing Authority listed as qualifica-

tions housing management experience and knowledge of the rules and regulations of the Federal Department of Housing and Urban Development, but that in making the selection to fill the executive director's position, the Board considered construction experience as a qualification. He also found that the appellant was more qualified for the position of executive director than was Dale Moore. Specifically, the hearing examiner found that the appellant had thirteen years of hands-on experience in managing multi-unit housing, whereas Moore had only minimal experience in housing management among other duties during his military service. The hearing examiner also found that the appellant had an excellent working knowledge of HUD rules and regulations, whereas Moore had difficulty with the rules and regulations and was required to consult with the executive director of the Keyser Housing Authority concerning such rules and regulations. The hearing examiner stated that because of time pressures the members of the Board failed to review the resumes and applications before them adequately and that, as a result of the Board's failure to hire her, the appellant was embarrassed and humiliated. The examiner concluded that the appellant had established a *prima facie* case of sex discrimination and that the reasons given by the Housing Authority for failing to hire her were a mere pretext for discrimination.

On September 10, 1986, the Human Rights Commission reviewed the hearing examiner's findings and conclusions and largely adopted them. The Commission, in effect, found that the appellant had been a victim of sex discrimination and awarded her back pay and incidental damages.

After the Human Rights Commission rendered its decision, the Town of Romney Housing Authority petitioned the Circuit Court of Hampshire County for review. The court reviewed the record in the case and, by order dated February 23, 1989, reversed the findings of the Human Rights Commission and denied the appellant all relief.

In reversing the decision, the court found that the evidence was not clear that the appellant was rejected, and Dale Moore hired, on the basis of sex. Contrary to what the hearing examiner found, the court noted that Mr. Moore's recent experience as acting director of the Housing Authority and his work on the project managed by the Authority supported his hiring on the basis of qualification. The court found that the applications of all four applicants were before the Board at the time the hiring decision was made and that about an hour was expended in reviewing the applications. The court concluded that the record showed that the Board knew of Dale Moore's abilities, dedication, dependability, and interest, and that the evidence did not show that the appellant was more qualified for the position than Mr. Moore.

In the present proceeding, the appellant claims that the trial court erred in reversing the decision of the Human Rights Commission.

Recently in *Mingo County Equal Opportunity Council v. State Human Rights Commission*, 180 W.Va. 240, 376 S.E.2d 134 (1988), the Court discussed the test to be employed in determining whether discrimination has occurred in situations such as the one involved in the present case.[1] In syllabus point 1, the Court stated:

> preponderance of the evidence a prima facie case of discrimination, which burden may be carried by showing (1) that the complainant belongs to a protected group under the statute; (2) that he or she applied and was qualified for the position or opening; (3) that he or she was rejected despite his or her qualifications; and (4) that after the rejection the respondent continued to accept the applications of similarly qualified persons. If the complainant is successful in creating this rebuttable presumption of discrimination, the

---

1. The appellant argues that this case should be decided under the test enunciated in syllabus point 3 of *Shepherdstown Volunteer Fire Department v. West Virginia Human Rights Commission*, 172 W.Va. 627, 309 S.E.2d 342 (1983). That test states that:

   In an action to redress unlawful discriminatory practices in employment and access to "place[s] of public accommodations" under The West Virginia Human Rights Act, *as amended, W.Va.Code,* 5–11–1 *et seq.,* the burden is upon the complainant to prove by a

"In order to make a prima facie case of employment discrimination under the West Virginia Human Rights Act, W.Va. Code § 5–11–1 *et seq.* (1979), the plaintiff must offer proof of the following:

(1) That the plaintiff is a member of a protected class.

(2) That the employer made an adverse decision concerning the plaintiff.

(3) But for the plaintiff's protected status, the adverse decision would not have been made."

Syl. pt. 3, *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986).

The Court went on to state that once a *prima facie* case of discrimination is established that: "Where a respondent presents a nondiscriminatory reason for the action in question sufficient to overcome the inference of discriminatory intent, the complainant's prima facie case is rebutted." Syl. pt. 2, *Mingo County Equal Opportunity Council v. State Human Rights Commission, Id.* And even where the *prima facie* case is rebutted: "The complainant may prevail if it is shown the reason presented by the respondent is merely a pretext for a discriminatory motive." Syl. pt. 3, *Mingo County Equal Opportunity Council v. State Human Rights Commission, Id.*

■ After examining the record presently before the Court, this Court believes that the appellant has clearly established that she, as a female, is member of a group protected under the Human Rights Statute, that she applied for the position which was open, and that she was rejected. To counter the appellant's case, the Town of Romney Housing Authority adduced the testimony of the members of the Town of Romney Housing Authority. From their testimony, it appears that at the time the selection was made the Housing Authority had before it the applications of four individu-

als, the appellant, Dale Moore, who was ultimately selected, and one other male and one other female. The evidence shows that the members of the Housing Authority discussed all the applications and the qualifications of the applicants over approximately a one-hour period during the selection process. At the conclusion of that period, the appellant was rejected and Dale Moore was selected for the opening which was available. There is no indication that after that point the Housing Authority continued to accept applications of similarly qualified persons.

Contrary to the appellant's allegations, further testimony in the record demonstrates that Dale Moore did have experience in the management of housing. It shows that while in the Navy, Mr. Moore was stationed in Kingsville, Texas, where it was his job to see that some 125 houses and apartments were occupied and maintained. Further, while he was stationed at Guantanamo Bay, Cuba, he worked in the Public Works Department, which managed some 900 units of family housing. The record also shows that Mr. Moore successfully filled the position of executive director of the Town of Romney Housing Authority, on a temporary or acting basis, for a number of months prior to the selection proceeding.

According to Leona Kidwell, a member of the Housing Authority Board at the time Mr. Moore had become involved in the Housing Authority, the project which the Housing Authority was managing was in trouble. Mr. Moore accompanied the Board members to Washington, D.C. to discuss the project with certain politicians. While there he displayed a good working knowledge of rules and regulations. At another point, she suggested that the Housing Authority's project had been al-

burden then shifts to the respondent to offer some legitimate and nondiscriminatory reason for the rejection. Should the respondent succeed in rebutting the presumption of discrimination, then the complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext for the unlawful discrimination.

In the present case, there is no evidence that after the rejection of the appellant the Town of Romney Housing Authority continued to accept the applications of similarly qualified persons. Thus, the Court believes that the general test set forth in *Mingo County Equal Opportunity Council v. State Human Rights Commission, supra,* rather than the more fact specific test in the *Shepherdstown* case, should control this case.

most in chaos when Mr. Moore was hired and that Mr. Moore had been instrumental in getting the project back on track. She further indicated that many of the difficulties involved construction, that only sixty units of the two hundred unit apartment project were complete, and the Board knew that Mr. Moore was very familiar with programming construction projects and with programmed maintenance.

This Court believes that the members of the Housing Authority did advance clear nondiscriminatory reasons for selecting Mr. Moore over the appellant. They indicated that the apartments which the executive director was to manage were incomplete and that there were serious construction problems potentially affecting the executive director's effectiveness. They indicated that, while serving as acting director, Dale Moore had very successfully coped with those problems and that, because of his extensive construction experience in the military, as well as his closeness to the project, they felt especially confident that as full time acting director he could handle like problems. There is some further suggestion that the members of the Housing Authority believed that the Authority might obtain some monetary assistance in paying Mr. Moore's salary from the Veteran's Administration because of the fact that Dale Moore was a disabled Viet Nam veteran.

In her brief, the appellant strenuously argues that the selection process was not fair because the Housing Authority considered qualifications other than those contained in its advertisement for the opening. She points to the fact that the advertisement for the opening made no mention of construction experience.

In reviewing the record, this Court believes that the record does suggest that the Housing Authority considered construction experience and that the Housing Authority failed to inquire into the appellant's qualifications in that area. In a human rights case, however, the question is not whether an employment decision was essentially fair or whether it was made in accordance with pre-established procedures. The question is whether the individual was discriminated against because of race, religion, color, national origin, ancestry, sex, age, blindness, or handicap. *W.Va.Code*, 5–11–2.

Recently, in *Currey v. West Virginia Human Rights Commission*, 178 W.Va. 471, 360 S.E.2d 387 (1987), the Court indicated that an employer may consider factors other than the specific skills involved in a position description in making a hiring decision. While in that case the Court indicated that the other factors might be such things as overall education, ability to communicate, ability to work with others, physical capacity to perform a job, and interest in and probable dedication to the job, the Court also believes that any description of qualifications for a position must, of necessity, be general, and implied in any such description there must be such qualifications as are reasonably necessary to carry out the general duties.

The vacant position in the present case involved the management of public housing. From the evidence adduced, it is clear that the management involved many construction problems. The Court believes that the ability to manage such construction problems was an implied qualification encompassed within the broader expressed qualification of housing management experience and that the hiring authority reasonably considered it in making the decision.

Overall, the Court believes that a fair reading of the record in the present case indicates that Dale Moore was selected because he had shown that he had the peculiar qualifications necessary to act in the position which was available. In effect, the Town of Romney Housing Authority met the test set forth in syllabus point 2 of *Mingo County Equal Opportunity Council v. State Human Rights Commission, Id.,* and demonstrated nondiscriminatory reasons for hiring Mr. Moore. There is nothing to show, or to raise the reasonable inference, that the reasons advanced constituted a mere pretext for discrimination. Under the circumstances, the Court concludes that the appellant has failed to establish that the Circuit Court of Hampshire County erred in failing to find discrimina-

tion and in overruling her human rights award.

The judgment of the Circuit Court of Hampshire County is, therefore, affirmed.

Affirmed.

MILLER, C.J., and McHUGH, J., dissent and reserve the right to file dissenting opinions.

MILLER, Chief Justice, dissenting:

The majority's view of this case is, at best, naive as to the facts and, at worse, a distortion of our human rights law. Conspicuously absent in the majority's Syllabus and its textual discussion is any mention of our traditional rule with regard to court review of an administrative decision. The rule is set out in Syllabus Point 2, in part, of *Shepherdstown Volunteer Fire Department v. State ex rel. West Virginia Human Rights Commission,* 172 W.Va. 627, 309 S.E.2d 342 (1983):

> "The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: '(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.'"

*See also Thomas v. West Virginia Human Rights Comm'n,* 181 W.Va. 428, 383 S.E.2d 60 (1989); *State ex rel. West Virginia Human Rights Comm'n v. Logan–Mingo Area Mental Health Agency, Inc.,* 174 W.Va. 711, 329 S.E.2d 77 (1985).

The only basis for overturning the Human Rights Commission's decision was that the judge disagreed with the Commission's view of the evidence. In essence, the circuit judge substituted his view of the facts for that of the Commission and its hearing examiner, who had heard the witnesses' testimony and were in the best position to judge their credibility. The majority obviously fails to discuss this standard of review because application of it in this case would have required reversal of the circuit judge's actions.

It must be remembered that the advertisement for the position of executive director of the Romney Housing Authority stated only two qualifications: (1) management experience, and (2) knowledge of the rules and regulations of the Department of Housing and Urban Development (HUD).

Ms. Gates had thirteen years of experience managing federal housing projects in Marlow Heights, a suburb of Washington, D.C., and was extremely familiar with HUD regulations. From 1969 through 1977, Ms. Gates was the resident manager of a 474–unit apartment project. She was responsible for preparation and rental of all units, implementation of both HUD regulations and company policy, review of tenant applications, and preparation of employees' work schedules. In 1977, Ms. Gates was promoted to property manager. In this capacity, Ms. Gates was responsible for developing and implementing the housing complex's annual budget and was the company's representative when negotiating with vendors, maintenance personnel, tenant organizations, and HUD officials.

Before working at the apartment project, Ms. Gates spent twenty years as co-owner of a fifty-unit motel on the St. Lawrence River and was instrumental in all decisions concerning management, construction, and repairs. From 1950 to 1957, she assisted her father in the construction and management of six business stores and five apartments.

In addition to possessing the two qualifications which were advertised in the paper, Ms. Gates also had extensive construction experience. While employed at the apartment complex, she oversaw the restoration of two units which had been severely damaged in a fire. In 1981, the company sent her to an apartment complex in New Jersey to supervise the refurbishing of sixty units which had been vandalized. Ms. Gates and her husband have completely restored three different homes, designed and built a garage apartment, and renovated a 100–

**214**

year–old eighteen-room house for business purposes. Even though Ms. Gates had outstanding qualifications, she was never even interviewed by the Housing Board. Neither were the two other candidates.

Instead, the Housing Authority selected one of its former members, Dale Moore, who had been the acting director for only six months. Contrary to the majority's assertion, except for his short tenure as acting director, Mr. Moore had no other managerial housing experience. He did have some construction and repair experience, but this was not a part of the advertised qualifications for the job.* Nor could it be demonstrated from the record that Mr. Moore had any more than minimal familiarity with HUD regulations.

The majority's decision flies in the face of precedents in other jurisdictions which hold that it is impermissible to post qualifications and then ignore them in hiring or promoting. In *Consolidated Edison Co. v. New York State Division of Human Rights*, 77 N.Y.2d 411, 568 N.Y.S.2d 569, 570 N.E.2d 217 (1991), for example, the Court of Appeals of New York held that promotion of an Hispanic male over a more experienced black female could not be justified on the ground that the male had a college education where the advertisement for the position did not list such an education as a requirement of the job. It has also been held unlawful for an employer to tailor job qualifications to suit the education and experience of a particular individual or to change the qualifications so as to exclude others from consideration where the true motive is race, sex, or other discrimination. *See, e.g., Geisler v. Folsom*, 735 F.2d 991 (6th Cir.1984); *Greer v. University of Arkansas Bd. of Trustees*, 544 F.Supp. 1085 (E.D.Ark.1982), *affirmed in part, vacated in part sub nom. Behlar v. Smith*, 719 F.2d 950 (8th Cir.1983), *cert. denied sub nom. University of Arkansas Bd. of Trustees v. Greer*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 552 (1984) (judgment

vacated by Court of Appeals only as to issue of damages). This is exactly what occurred in this case. It is apparent that the majority's refusal to discuss the law is reflective of its inability to justify its legal position.

It seems evident that Mr. Moore's additional "qualifications" were only a pretext to justify the Housing Authority's decision to hire him over the more experienced and, according to the objective criteria set forth in the advertisement, the more qualified Ms. Gates. Mr. Moore's real qualifications were his connections with the local political scene, which doubtless played a role in his selection. In addition to lacking this "qualification," Ms. Gates also had the misfortune of having been born both female and Canadian.

For the foregoing reasons, I dissent, and I am authorized to state that Justice McHUGH joins me in this dissent.

---

* The majority speaks of Mr. Moore's work in the Navy at Kingsville, Texas, where "his job [was] to see that some 125 houses and apartments were occupied and maintained," and of his job at Guantanamo Bay, Cuba, for the Public Works Department, "which managed some 900 units of family housing." 185 W.Va. at 211, 406 S.E.2d at 437. The Commission found that Mr. Moore's work was not as a manager, but as a maintenance person. Even the majority acknowledges Mr. Moore's real work experience when it speaks "of his extensive construction experience in the military." 185 W.Va. at 212, 406 S.E.2d at 438.